IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SILVIA SEPULVEDA-RODRIGUEZ,

               Plaintiff,

    v.

METLIFE GROUP, INC., a New York
Corporation;  METROPOLITAN LIFE
INSURANCE COMPANY, a New York
Corporation; and  FORD MOTOR
COMPANY, a Delaware Corporation;

               Defendants.

**8:16CV507**

**AMENDED
MEMORANDUM AND ORDER**

      This matter is before the court on the parties' cross motions for summary judgment, Filing Nos. 56, 58 and 65.[1]  Although styled as cross-motions for summary judgement this is an action for judicial review of an administrative determination denying benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*   The plaintiff alleges defendants wrongfully denied her claim for life insurance benefits under a policy provided by late husband's employer.  She seeks a reversal of that determination.  The defendants move for a judgment affirming the decision.

      The plaintiff alleges five claims.  She first seeks the statutory penalty for failure to provide plan documents, specifically, the Summary Plan Description ("SPD") under 29

---

[1]The defendants seek dismissal of all claims against defendant MetLife Group, Inc. ("MetLife"), a corporate affiliate of defendant Metropolitan Life Insurance Company ("Metropolitan").  They contend that MetLife is an improper and unnecessary party and was not involved in the employee benefit plan at issue.  *See* Filing No. 60, Brief at 3 n.1.  The plaintiff has not responded to or objected to that contention.  The record shows Ford and Metropolitan are the plan fiduciaries and are proper defendants.  Accordingly, the plaintiff's claims against MetLife will be dismissed.

U.S.C. § 1132(c) from defendant Ford Motor Company.[2]  Filing No. 32, First Amended Complaint at 5.  She next seeks an award of benefits pursuant to 29 U.S.C. §1132(a)(1)(B) from defendants MetLife Group, Inc. and Metropolitan Life Insurance Company ("Metropolitan").[3]  The plaintiff also asserts three claims for equitable relief under 29 U.S.C. § 1132(a)(3) against both Ford and Metropolitan and seeks relief in the nature of surcharge, reformation and equitable estoppel.

In its motion, Met Life seeks dismissal of the plaintiff's claims.  It asks the court to affirm Metropolitan's determination.  Metropolitan argues its claim determination was not an abuse of discretion.  It also contends that the plaintiff's breach of fiduciary duty claims are improper under ERISA and are barred by the decedent's allegedly inequitable acts.

Defendant Ford seeks dismissal of the plaintiff's penalty claim as well as her claims for breach of fiduciary duty.  Ford argues it substantially complied with ERISA requirements to provide the SPD and contends that because the plaintiff has a remedy for the benefits she seeks under Section (a)(b)(1), there is no need for a duplicative equitable claim.

The plaintiff seeks a summary judgment against defendant Ford for damages in the amount of the statutory penalty for failure to timely provide plan documents.  Further, she asserts she is entitled to judgment in her favor on her claims for benefits and breaches of fiduciary duty under 29 U.S.C. §§ 1132 (a)(1)(B) and (a)(3).  She urges

---

[2] By stipulation of the parties the court dismissed Claim I as to defendants MetLife and Metropolitan.  Filing No. 43.  The parties agreed that it is Ford's duty, as the plan administrator, to provide the SPD.

[3] Similarly, by stipulation of the parties, the court dismissed this claim against defendant Ford.  *Id.*

the court to reverse the decision denying the plaintiff's claim for optional life insurance benefits.

I.     FACTS

A.     Background

The facts are gleaned in part from the parties' statements of undisputed facts, the administrative record and affidavits submitted in connection with the motions.   *See* Filing No. 53-1, Administrative Record (Restricted) ("Admin. R."); Filing No. 57, Ford's Brief at 5, 7-14; Filing No. 60, Metropolitan Brief at 2-8; Filing No. 67, Plaintiff's Brief at 1-5; Filing No. 68, Ford Reply Brief at 3-4; Filing No. 69, Metropolitan Reply Brief at 3-4; Filing No. 70, Plaintiff's Reply Brief at 1-4.   The administrative record filed by Metropolitan includes a copy of the Ford Motor Co. Life and Accidental Death and Disability Policy ("the Plan") and screenshots of the online version of the Summary Plan Document ("SPD") for the Plan.   *See* Filing No. 53-1, Adm. R. at 120-141.   In addition to the Plan documents, the record contains 27 pages of Metropolitan internal records, numerous medical records authorization forms, the decedent's medical records dating back to 2008, and correspondence to and from the plaintiff's counsel.[4]   *Id.* 142-169.

It is undisputed that Ford Motor Company is the Plan Sponsor and Plan Administrator of the Plan.   Metropolitan is the insurer and claim administrator under the

---

[4] The internal claim records are somewhat cryptic and include various acronyms and insurance jargon.   The internal documents include emails, various computer screen shots, "inquiry snapshots" that apparently document telephone calls and refer to correspondence and emails, and a digital "comments list," which apparently documents intra-company communications and work-flow.   The record also contains computer printouts, in the nature of spreadsheets, of digital records that ostensibly show responses to medical history questions, but there is no explanation of the meaning of the coded responses or any way to correlate the answers to questions.   *See e.g., id.* at 244-45.   Some documents in the record are highlighted and redacted but there is no record of who highlighted or redacted them.

Plan.[5]    The parties agree Metropolitan issued Group Insurance Policy Nos. 113729-1-G, 113729-G and 113729-16-G to Ford Motor Company.   Ford's SPD states that:   "The Plan Administrator and Metropolitan have discretionary authority to construe, interpret, apply and administer the Plan. Decisions of the Plan Administrator and Metropolitan are final and conclusive, and are only subject to the arbitrary and capricious standard of judicial review."   Filing No. 53-1, Admin. R. 138 & 139.   Ford provided Basic Life Insurance to employees at no cost to them, but employees had to pay the cost of any Optional Life Insurance they elected.   *Id.* at 123.

The plaintiff is the widow of Jose Monarrez ("the decedent"), who died on June 4, 2015, of "hypertensive and atherosclerotic heart disease."   Filing No. 53-1, Admin. R. at 188.   The decedent was employed by Ford as a customer service representative beginning on October 1, 2013.   Monarrez enrolled in the Plan when he first became eligible, and benefits were effective on or after November 1, 2013.   He requested both basic life insurance coverage in the amount of one and a half times his base annual earnings of $37,077.60 (or $55,616.00) and optional employee life insurance coverage in the amount of two and a half times his base annual earnings, which amounted to $92,694.   *Id.* at 186-87, 504.   After he submitted his application for Optional Life Insurance, premiums were withheld thereafter by Ford and forwarded to Metropolitan. *Id.* at 123-24.

---

[5] The difference between a claims administrator and a plan administrator is that "whereas a plan administrator makes 'plan-level decisions about covering employees (e.g., whether employee x will be covered at all—for anything—under the policy),' a claims administrator makes 'claim-level decisions about paying benefits (e.g., to what extent employee x's visit to doctor y on date z is covered).'" *Pearson v. Wellmark, Inc.*, No. 4:15-CV-3164, 2017 WL 2371142, at *5 (D. Neb. May 31, 2017)(quoting *Werb v. ReliaStar Life Ins. Co.*, 847 F. Supp. 2d 1140, 1146 (D. Minn. 2012).   "Presumably, then, the claims administrator's duties are more limited and circumscribed than the plan administrator's." *Id.*

After Monarrez's death, Metropolitan paid the basic life benefit of $55,616 to the plaintiff, his widow.  *Id.* at 144.  Metropolitan denied the plaintiff's claim for optional life insurance benefits.  *Id.* at 153, 414-15.

With respect to optional life insurance, the Plan provides:

If You complete the enrollment process when first eligible for Optional Life Insurance and Optional Accident Insurance under the Flexible Benefits Plan, such insurance will take effect as follows:

- for any amount which You are **not required** to give evidence of Your insurability, such insurance will take effect on the later of the date You become eligible for such insurance and the first day of the calendar month following the date You complete the Enrollment Process, if You are Actively at Work on that date.  You are **not required** to give evidence of Your insurability for Optional Accident Insurance.

- for any amount for which You are **required** to give evidence of Your insurability and We determine that You are insurable, such insurance will take effect on the first day of the calendar month following the date We approve Your evidence of insurability, if You are Actively at Work on that date.

*Id.* at 57 (emphasis in original).  The Plan defines Proof as follows:

Proof means Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate. When a claim is made for any benefit described in this certificate,

Proof must establish:  the nature and extent of the loss or condition; Our obligation to pay the claim; and the claimant's right to receive payment.

Proof must be provided at the claimant's expense.

*Id.* at 54.

The SPD provides that employees are eligible to enroll in optional life insurance on the date of hire or rehire and "Coverage is effective the first of the month following enrollment date or the first of the month following approval of Statement of Health,

5

whichever is later." *Id.* at 123. The coverage effective date the first of the month following approval of a Statement of Health form (if required). *Id.* Proof of good health for optional life insurance is described as follows:

**Proof of Good Health - Optional Life Insurance**

If you elect coverage or increase your coverage when first eligible, during annual enrollment or due to a Qualified Event, you must provide proof of your good health before the election or increase will be effective.

The process of providing proof of good health involves answering five questions about your health status. Depending on your answers to these questions, you may also need to complete a more detailed questionnaire (i.e., a Statement of Health form). In addition to a Statement of Health, medical records or a physical examination may be required at your expense. Any life insurance elections that require proof of good health will not go into effect until evidence of insurability is received and approved by MetLife. MetLife makes all decisions regarding approvals.

*Id.* at 125. Neither insurability, good health, nor statement of health are defined in the Plan documents.

The plaintiff filed a claim under the policy on September 21, 2015. *Id.* at 189-90. Metropolitan responded with a letter stating an investigation was necessary with respect to the claim for optional benefits. *Id.* at 195, 207. Metropolitan also contacted Ford's third-party administrator for confirmation of the decedent's enrollment in the Plan. *Id.* at 193-98. The response indicated that the optional life coverage was elected during the 2013 new hire enrollment. *Id.* at 193. The record contains several screenshots of computer images with typed notations showing that Monarrez was a "new-hire_rehire eff 10-1-13," and had Optional Life coverage effective on November 1, 2013. *Id.* at 200. Another screenshot indicates an annual enrollment effective January1, 2015. *Id.* at 199.

Thereafter, internal records show the following task was assigned to Metropolitan employee Edward Sullivan, who is identified in the record as a Senior Client Services Consultant:

> Insured enrolled in Optional Life coverage as new hire on 11/1/2013 for 2.5 of base annual earnings ($92,694.00). Per Plan Master under [Medical Evidence of Insurability or] MEOI: New hire participants who enroll initially eligible are subject to MEOI. All amounts require medical questions. Can you please provide me with his questionnaire or confirm that he answered No to all medical questions.

*Id.* at 506. The reason for the request is shown as "MEOI Provisions Need assistance Obtaining enrollment History from Employer." *Id.* On October 8, 2015, Sullivan emailed the following to Terrence Davis and Robert Skulnik:

> We suddenly seem to have more frequent inquiries from our group life claims office. This one is regarding JOSE L MONARREZ, SSN [redacted], who died on June 4, 2015. The claim amount we need more information on is $92,694.00 of Optional Life Insurance that was effective November 1, 2013.
>
> Can one of you provide me with a screen print of the enrollment history and the answers to the five medical questions? With this being within the two-year contestability period, we'll need his responses to the five medical questions he should have answered at the time of his enrollment. If you provide this in the format of an Excel file, please include the questions, answers, the employee's name, and the date/time of the web transaction. We need all of this information included for the purpose of documenting the claim file.

*Id.* at 239 (redaction added). Rob Skulnik, Client Service Manager, HR Outsourcing Solutions, Xerox HR Services, LLC, responded that "This [participant] made this election as a new hire back in 2013. He was not required to answer the questions. Do you want a screen shot of that election?" *Id.* at 205. The following day, Sullivan again emailed Skulnik, asking him to double check the new hire enrollment for the medical questions. *Id.* at 204. After several more requests for the information, Skulnik

responded "We have no record of this [participant answering the EOI questions." *Id.* at 203. On October 19, 2015, Sullivan again emailed Skulnik asking for information. *Id.* at 202. Skulnik replied "Ed, we are still researching into further but this appears to be an isolated case and our research so far shows the questions were asked but not recorded in our system." *Id.*

Internal records also contain screenshots headed "MetLife Life Claim Request Entered" and additional notations indicating "WebMaker – Application" and a web address. *Id.* at 500-507. Those records and computer generated notices of comments to workflow show a Claim Inquiry was completed on October 15, 2015 as follows: "The [Third Party Administrator or] TPA responded via email that the medical questions were not asked when this person enrolled as a new hire. The GLIF plan is correct - MEOI is required for new hire enrollments and the questions should have been asked. Please see attached[,]" apparently referring to the screenshots set out above. *Id.* at 198, 507. Notes created on October 21, 2015 by Edward Sullivan state:

> The employer's TPA [third party administrator] has indicated they are still researching the case further but this appears to be an isolated case and their research so far shows the questions were asked but not recorded in their system. In order for the coverage to go into effect, the TPA states their programming requires "no" responses to all questions; otherwise, coverage would have been pended for MetLife approval of a SOH. Please see the attached email exchange.

*Id.* at 505. Notes created by Tamara Wurz, identified as a Life Claim Examiner, to Edward Sullivan dated November 30, 2015, state:

> Would you please check to see if they are able to provide us with evidence of the data that they do have—is there something showing that the 5 medical questions had been asked but the answers not recorded? also, can they show us an example of an enrollment where the answers to the medical questions were recorded so that we could compare?"

*Id.* at 503. An email dated December 1, 2015, from Terrence Davis at Xerox HR Solutions to Edward Sullivan later states "I was able to find some more info on this. The election was processed through a CSR via IVR enrollment. In the attached, I've highlighted the recorded questions and answers for optional life as of 11/5/2013." *Id.* at 234. The record contains no explanation of the meaning of those terms. Following that email, the administrative record contains a spreadsheet, a listing of questions—some incomplete, a sheet of computer data sets in columns and 27 separately listed date and time stamps each indicating "11/5/2013 7:17:59." *Id.* at 242-44.[6]

On 12/07/2015, Sullivan states:

Upon further review, the TPA found the medical questions and answers had been recorded after all. I was informed that the person who handled the initial inquiry may not have been accessing the correct table to obtain the data. Please see the attached email. The Excel file provided has the questions in rows 20 -28 and the responses in column Q. The employee answered no to all questions according to the data.

*Id.* at 503. The life claim inquiry was reviewed and closed on December 29, 2015. *Id.* at 502.

A senior referral form authored by Tammi Wurz and dated January 22, 2016 states:

Received claim with [Optional Life Insurance or] OLI coverage. The OLI effective date is 11/01/2013 and Insureds [date of death or] dod 06/04/2015 —previous examiner requested 2 yrs. of medical history per lcl response In comments, the firm assures that the medical questions are asked and prior to coverage becoming effective all medical answers must be answered "no" —they are unable to provide this information but state if they had not been asked and answered no then this individual would have been flagged on their end of SOH/Metlife approval. Letters had been sent

---

[6] Metropolitan contends that these cryptic documents show the Monarrez completed an electronic questionnaire on November 5, 2013 in which he answered "no" to all of the questions asked. The court finds the documents do not establish that proposition.

to numerous doctors/hospitals and received 1st response back requesting additional authorization prior to releasing Information. Insureds death due to hypertensive and artherosclerotic (sic) heart disease. **medical records received— records from Alegent Health Clinic show treatment for HTN from pg 145-191 which includes date ranges all prior to the time the Insured would have answered medical questions.

*Id.* at 402. Wurz suggested that the senior reviewer "advise if should be sent to SOH at this time to see if insured would've been approved." *Id.* at 403. The Senior Reviewer, Charles Rose, responded on January 22, 2016:

Agree please refer to SOH with a PDF of all medical records, should the insured have marked off yes to one or more of the medical record questions. Specifically, should he have marked 'Yes" to the question about chest pains. 2. If a SOH would have been triggered, based on the medical records, would the SOH had been declined. If so, on what basis? Once we receive a response from SOH, please re-refer to Srs.

*Id.* at 403. On Jan 26, 2016, Tamara Wurz wrote, via email, to Senior Statement of Health Specialist Wes Vivyan. The record indicates Wurz asked:

Please see medical records provided and advise:

1. Based on the medical records, should the insured had marked off "Yes" to one or more of the medical question. Specifically, should he have marked "Yes" to the question about chest pains.

2. If a SOH would have been triggered, based on the medical records, would the SOH had been declined. If so, on what basis?

*Id.* at 405. In response, email correspondence from Kelly Zawada, apparently a Metropolitan underwriter, dated Jan 26, 2016, states:

Based on the medical records received if the insured had submitted a Statement of Health to us and had indicated the conditions listed in his medical records (Hypertension, hyperlipidemia, chest pains) he would have had to have checked off the box indicating cardiovascular and indicated chest pains in the comment section. The high blood pressure is a seperate (sic) question and is self explanatory on the SOH. We normally would not work up hypertension or hyperlipidemia based on a Statement of Health unless the applicant was being treated specifically by a cardiologist or had multiple medications noted that could indicate a

condition other than what was reported.  Had the applicant indicated chest pains on the SOH we would have worked this up.

Review of the medical records the applicant appeared to have been treating with a [primary care provider] and had referrals on several occasions to cardiology for further work up or chest pain.  However after investigating into the notes a little more closely it appears that there was a history and ongoing use of cocaine and alcohol and MD advised the patient to cease cocaine use on multiple occasions.  This could have been a factor in the chest pains.  There was some sort of cardiac work up, records submitted however nothing significant or abnormal that would contribute to chest pains.  MD advised for the patient to continue to take medications for hypertension and hyperlipidemia which again in the notes the MD indicates the patient was a not compliant at all times, stating "he ran out of meds" or "I stopped taking the meds because I felt better."

Had the chest pains been worked up and medical that came in that indicated it was not cardiac in nature but due to drug and alcohol abuse that was current he may have been declined based on our guidelines.  However the records were dated back to 2004-2009 with the exception of an operative report from 2014 as well as an office note form March 2015 which did not indicate any drug/alcohol abuse or non-compliance at that time.

*Id.* at 404.  On January 28, 2016 the file was returned to the claims examiner with this notation:

RETURNED TO TAMMI:  It's unclear what the definitive answer is.  Also, not sure what is meant by "work up".  Please reach back out and ask them to kindly answer yes or no:  1.  Based on the medical records we have on file, should the insured have answered yes for being diagnosed with chest pains?  2.  If he answered yes, would that have triggered a full SOH?  3.  If yes, based on the medical submitted, would the insured have been declined for the increase in insurance coverage?  4.  If we do not have enough information, can you at least confirm, based on the medical we received, that the insured should have checked yes to one or more of the medical questions, which would have triggered a full SOH?

*Id.* at 154.  Senior Reviewer Charles Rose wrote the following on February 2, 2016:

TO TAMMI TO [DRAFT] DENIAL BASED ON MEDICAL QUESTIONS NOT ANSWERED CORRECTLY AND SOH CONFIRMING A SOH

WOULD HAVE BEEN TRIGGERED AND A FULL WORK UP WOULD
HAVE BEEN REQUIRED

*Id.* at 154.

The record shows that the plaintiff called Metropolitan inquiring about the claim in early February 2016. *Id.* at 153. In her affidavit, the plaintiff states that in a phone call on February 9, 2016, Kelly Zawada informed her that Metropolitan was prepared to pay $92,691, but was awaiting some sort of additional approval "from Ford Credit." Filing No. 66-1, Index of Evidence, Ex. 1, Affidavit of Silvia Sepulveda-Rodriguez ("Sepulveda-Rodriguez Aff." at 3.

Metropolitan denied the Optional Life Insurance benefits in a letter dated February 15, 2016. *Id.* at 153, 414-15. Metropolitan quoted language that appears in the Plan under the heading "Changing Your Elections," and stated:

> According to our records, the decedent first elected Optional Life Insurance during his 2013 new hire enrollment. The Plan states that when a request to enroll in Optional Life Insurance coverage is made part of the process of providing proof of good health involves answering five questions about your health status. Mr. Monarrez answered "no" to all of these medical questions. Based on the medical records we have obtained and reviewed, Mr. Monarrez should have answered "yes" to one or more of the medical questions. If these questions had been answered accurately a full Statement of Health would have been required. Per the Plan any life insurance election that required proof of good health would not have gone into effect until evidence of insurability had been received and approved.

> We do not have any record of a completed Statement of Health form being submitted. Since a Statement of Health form as evidence of insurability was never received and therefore, not approved, there was no Optional Life Insurance in effect at the time of his death.

> Therefore, based on the record before MetLife, we must deny your claim for Optional Life Insurance.

*Id.* at 415.

Metropolitan continued to receive Monarrez's medical records from February to May 2016. *Id.* at 150-51. Under the heading "Activity," comments entered on a document entitled "Claim Comments List" dated April 20, 2016 indicate that an appeal had been received. *Id.* at 150. In her appeal, the plaintiff requested documents, including the policy, the SPD, and the decedent's answers to the questionnaire referenced in the denial letter. *Id.* at 435. She based her appeal on the contention that Metropolitan could not have relied on any such representations because her late husband had undergone two physical examinations for the purpose of life insurance and she produced records of those examinations. *Id.* Tamara Wurz again referred the appeal to a senior claims representative for review. *Id.* at 150. An informational comment authored by David Indolfi dated April 29, 2016 states:

> draft uphold of the denial for the [Optional Life Insurance or] OLI based upon the misrepresentation on the short form medical questions. Specifically answering no for high blood pressure when the medical provided show a past medical history of hypertension as well as that was the cause of death. In uphold be specific to the questions asked that he misrepresented and the information in our claim file that reflects he was aware of the high blood pressure prior to completing the questions. Also prepare a copy of the claim file for the claimant.

*Id.* A denial letter was sent to the plaintiff on May 18, 2016. *Id.* at 149. In its letter denying the plaintiff's appeal, Metropolitan stated:

> You have filed an appeal based on your disagreement that Mr. Monarrez's answers on the questionnaire could have been false. Based upon the review of Mr. Monarrez's medical records received from his various physicians' it has been determined that Mr. Monarrez's answers were a misrepresentation. Specifically his "no" answer to question regarding high blood pressure when past medical history shows hypertension which happens to also be the cause of his death.

*Id.* at 451. Internal records show mail was received on June 28, 2016, and the following was noted "6/27 - rcvd letter from attny for Silvia advising did not receive response to appeal and did not receive requested documents to team to review and respond to attny." *Id.* at 149. The file was again referred to Senior Review in July 2016. *Id.* On August 23, 2016, notes indicate an appeal had been received. *Id.* at 148.

On September 8, 2016, comments by Senior reviewer Kay Fleming show that the file was returned to Claim Examiner calling for further review:

> [State of Health or] SOH said that they would not request additional documentation unless the [employee] had hypertension and hyperlipedia and was being treated by a cardiologist and being medicated. They also say that based upon the medical records, the [employee] should have stated they had chest pains. The questionnaire (pg 74) does not appear to ask about chest pains; however, the question for Have you even been diagnosed or treated by a phsycial [sic] or other healthcare provider for--- does not show the drop downs, only the next question which is diagnosed, treated, or given medical advice by a phyician [sic] or other healthcare provider for. . . . 1) Is there more to this form where the first question is? 2) Planmaster states we ask about chest pains; however, this form doesn't show that question. 3) Planmaster does not state that we has about hypertension but their questionnaire does. Complete an mpm and ask if they have an agmt at signing of what questions we are supposed to be asking.

*Id.* at 148, 463. Following a senior referral form containing the above-quoted language under the heading "Course of Action" is a single page document that lists nine health-related questions, with space for entry of "yes" or "no" answers. *Id.* at 464.

On 9/12/2016, Tamara Wurz followed up as follows:

> we previously denied the optional life portion of this claim due to the required medical questions not being answered accurately and if they had a statement of health would have been required. they have filed an appeal and we need additional information upon our further review. Is there an agreement at signing of what questions we are suppose (sic) to be asking? Their questionnaire does not appear to ask about chest pains but plan master states that we do? Plan master does not state that we

ask about hypertension however their questionnaire does.  Please review discrepancies and advise.

*Id.* at 501, 148.   On 09/26/2016, Wurz indicates in the claim Comments List that a response was received.   *Id.* at 147.   Senior Claims Examiner Edward Sullivan responded:

> Tamara, I attached the full text of the medical questions that Ford asks at the time of enrollment.  The documentation of this employee's answers had some of the text of the questions cut off.  Please note these are the standard MetLife questions for life only enrollments when it is done on paper. The paper version questions are used even though it is an online enrollment because it is not on MetLife's website.  Please note that GLIF does not have the option select the exact wording of these questions so the closest ones are chosen in the applicable plans.

*Id.* Wurz then suggested the file again be referred for Senior Review of information preciously submitted.   *Id.*  The summary of the referral refers to a prior senior response indicating

> Discussed with UL Pati, we will deny the additional [optional life insurance]. Please draft denial In the denial letter quote the language from the Changing Elections section and the from Plan regarding Proof of Good Health-Optional Life Insurance and also quote the section.  Also quote the section about coverage not being eff[ective] until after a SOH Is completed. We will deny based on the medical records on lie, the Insured should've answered yes to one or more of the medical questions— specifically regarding chest pains.  If he had answered yes that would have triggered a full SOH and based on the medical records presented if he had answered the SOH questions correctly, we would have required a full medical work-up prior to the coverage being effective. This is quoted in the Statement of Health section.  A SOH was required but because the medical questions were not answered correctly, we never requested one. As an approved SOH was required and one was never approved, the coverage Is not valid.

*Id.* at 490.  The file was referred and reviewed by Andrew Borelli, who concluded on October 11, 2016:

> The claim was re-reviewed and discussed with management. The claim
> file has previously been supplied to the claimant and to her attorney. The
> claimant's appeal has already been reviewed and our decision to deny
> was upheld. We have notified the attorney how to obtain the SPD, as it is
> the benefit administrator's responsibility to provide it. Decision to deny
> remains unchanged. Will notify attorney in writing that decision to deny
> remains unchanged, and send copies of the medical question answers
> again.

*Id.* at 147, 490.

In her appeal of the denial, the plaintiff submitted records of physical examinations Monarrez and his wife underwent on or about March 23, 2015, believing them necessary to maintain his life insurance. *Id.*, 409, 437-44; Filing No. 66-1, Sepulveda-Rodriguez Aff. at 2-3. Medical records submitted to Metropolitan also showed that Monarrez had undergone sinus surgery in May of 2014 and records show no cardiac problems. Filing No. 53-1, Admin. R. at 248-306.

The plaintiff has submitted evidence that, because they believed Monarrez to be covered by the Optional Life Insurance, neither Mr. Monarrez nor his widow obtained additional life insurance for him. Filing No. 66-1, Sepulveda-Rodriguez Aff. at 1. The defendants have submitted an affidavit stating that the medical examinations that the plaintiff and her decedent underwent in March 2015 had no relationship to the optional life insurance benefit. Filing No. 59-1, Second Affidavit of Jennifer Konarske ("Konarske Aff. 2"). She states the records of the decedent's wellness examination were provided only to the third-party vendor that administered the Ford's wellness benefit, not to either Ford or to Metropolitan. *Id.* at 2. To the contrary, the record shows records of the wellness examination were provided to and considered by Metropolitan in making its determination. Filing No. 53-1, Admin. R. at 404, 409-10, 437-42.

The plaintiff requested the relevant summary plan description (SPD) from defendant Metropolitan on April 15, 2016; June 23, 2016; August 19, 2016; and September 1, 2016. *Id.* at 434, 453, 458, 472. The record shows Metropolitan provided copies of the claim file to the plaintiff's attorney in July 2016, but did not inform the plaintiff that she would have to obtain the SPD from the employer. *Id.* at 149-50. Metropolitan Life eventually responded in a letter dated August 26, 2016, without providing the SPD, and directed the plaintiff to submit an inquiry to Ford National Employee Services Center ("Ford NESC"). *Id.* at 461.

The plaintiff did so on September 1, 2016 and again on October 4, 2016. *Id.* at 465, 472. The record shows the Ford NESC handles plan administration for the policy at issue. Filing No. 57, Ford Brief at 13-14, Affidavit of Jennifer Konarske ("Konarske Aff.") at 1-2. Ford NESC's records show that plaintiff's attorney's letter of September 1, 2016, requesting a copy of the SPD was received by Ford NESC on September 7, 2016. *Id.* at 2. Ford NESC mailed the SPD to the attorney on October 28, 2016. *Id.* Ford admits it inadvertently failed to mail the SPD to Mr. Skalka within 30 days of September 7, 2016, but contends it did not act in bad faith or intend to cause harm to the plaintiff. *Id.* Plaintiff's former attorney received the SPD from Ford NESC on November 3, 2016. Filing No. 66-1, Sepulveda-Rodriguez Aff. at 4.

In addition, Ford has shown the SPD is available online at all times to all Ford employees at www.myfordbenefits.com. Filing No. 57, Konarske Aff. at 2. The SPD is available to any employee who is a plan participant and to any employee's spouse who is a beneficiary and has the employee's user name and password. *Id.* The plaintiff

stated she did not know the document was online and did not know her deceased husband's username or password. Filing No. 66-1, Sepulveda-Rodriguez Aff. at 4.

II.      LAW

    A.      Summary Judgment Standards

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A "genuine" issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party. *Id.* at 251-52. "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004.)

    B.      Scope of review

Under ERISA, when a denial of benefits is challenged through judicial review, "the record that was before the administrator furnishes the primary basis for review." *Trustees of Electricians' Salary Deferral Plan v. Wright*, 688 F.3d 922, 925 (8th Cir. 2012); *see also* *Brown v. Seitz Foods, Inc., Disability Benefits Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998) (suggesting a district court should ordinarily limit its review to the evidence contained in the administrative record). When reviewing the denial of benefits

under an ERISA plan, "the general rule is that review is limited to evidence that was before the administrator." *Atkins v. Prudential Ins. Co.*, 404 Fed. App'x 82, 84 (8th Cir. 2010) (internal quotation marks omitted). The review of a benefits decision is generally confined to the information available at the time of the claim decision. *Farley v. Arkansas Blue Cross & Blue Shield*, 147 F.3d 774, 777 (8th Cir. 1998). However, new evidence may be considered under certain circumstances in order to enable the full exercise of informed and independent judgment. *Kostecki v. Prudential Ins. Co. of Am.*, No. 4:14-CV-695, 2014 WL 5094004, *1 (E.D. Mo. Oct. 10, 2014).

Although discovery of information outside of the administrative record is generally not allowed, the limitation "does not apply to claims involving ERISA plans when the claims are for equitable relief under § 1132(a)(3) or for equitable estoppel." *Id.*; *see e.g., Jensen v. Solvay Chems., Inc.*, 520 F. Supp. 2d 1349, 1355 (D. Wyo. 2007) ("Case law does not constrain discovery under ERISA § [1132](a)(3) actions."); *Vogel v. Anheuser Busch Companies, Inc.*, 2014 WL 3894497, at *1 (E.D. Mo. Aug. 8, 2014) (holding the claimant was "entitled to limited discovery regarding his claims for civil penalties and equitable estoppel"). "This is so because these types of actions 'do not benefit from the administrative process.'" *Kostecki*, 2014 WL 5094004 at *1 (quoting *Jensen*, 520 F. Supp. 2d at 1355).

C.      ERISA Claim for Benefits

The underlying purpose of ERISA is to protect the interests of participants in employee benefit plans and their beneficiaries. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989); 29 U.S.C. § 1001(b). Under ERISA, a plan "participant or beneficiary" may bring a "civil action" to "recover benefits due to him

under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Claims administrators may be sued as defendants under 29 U.S.C. § 1132(a)(1)(B) and (3). *See Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1081, 1088 (8th Cir. 2009); *accord Harris Trust & Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 246 (2000) (holding that non-plan defendants may be sued under those provisions). The proper party defendant in a claim for benefits under section (a)(1)(B) is the party required by the plan to pay the benefits. *Brown*, 586 F.3d at 1088.

"In general, a claim administrator's denial of benefits is subject to de novo review by the district court." *Cooper v. Metro. Life Ins. Co.*, 862 F.3d 654, 660 (8th Cir. 2017); *see Bruch*, 489 U.S. at 115. Where the plan grants the administrator or fiduciary "discretionary authority" to determine eligibility for benefits, however, the standard of review is relaxed, and abuse of discretion becomes the appropriate benchmark. *Cooper*, 862 F.3d at 660; *see also Donaldson v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 863 F.3d 1036, 1039 (8th Cir. 2017); *Yafei Huang v. Life Ins. Co. of N. Am.*, 801 F.3d 892, 898 (8th Cir. 2015).

Where "'a plan administrator holds the dual role of evaluating and paying benefits claims,' this conflict of interest should be considered 'as a factor in determining whether the plan administrator has abused its discretion.'" *Donaldson,* 863 F.3d at 1039 (quoting *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010)); *see also Huang*, 801 F.3d at 898. The simple fact a conflict exists, however, does not eliminate the administrator's discretion or change the court's review of the administrator's decision to *de novo* review. *Id.*; *see Brake v. Hutchinson Tech. Inc. Grp.*

*Disability Income Ins. Plan*, 774 F.3d 1193, 1196 (8th Cir. 2014) (stating the court takes "this inherent financial conflict of interest into account in deciding whether an abuse of discretion has occurred."). "While a conflict of interest must be 'weighed as a factor,' the weight afforded to it will depend on the facts presented to the court." *Cooper*, 862 F.3d at 661 (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (citation and quotation omitted)).

The factors courts "have identified in the past as tending to demonstrate a consequential conflict of interest include evidence that the insurer's claims review process was tainted by bias; that the medical professionals who reviewed the claim for benefits were employed by the insurer, or that their compensation was tied to their findings; and that the insurer acted as little more than a rubberstamp for favorable medical opinions." *Id.*; *see Whitley v. Standard Ins. Co.*, 815 F.3d 1134, 1140 (8th Cir. 2016); *Carrow v. Standard Ins. Co.*, 664 F.3d 1254, 1259 (8th Cir. 2012). "Where an insurer has a history of biased claims administration, the conflict may be given substantial weight, but where the insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight." *Darvell v. Life Ins. Co. of North America*, 597 F.3d 929, 934 (8th Cir. 2010)(noting that when the record contains little evidence of the insurer's efforts to ensure that the conflict did not affect eligibility determinations, a court properly gives the conflict some weight, but it is not determinative). Also, procedural irregularities may trigger heightened review. *Carr v. Anheuser-Busch Companies, Inc.*, 495 F. App'x 757, 763 (8th Cir. 2012).

When reviewed for an abuse of discretion, "an administrator's decision is upheld if it is reasonable, that is, supported by substantial evidence . . . [which] means 'more than a scintilla but less than a preponderance.'" *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 717 (8th Cir. 2014)(quoting *Darvell,* 597 F.3d at 934 (citations omitted)); *see also Cooper*, 862 F.3d at 660. To determine if a plan administrator's interpretation of policy terms is reasonable, the court examines: (1) whether their interpretation is consistent with the goals of the plan, (2) whether their interpretation renders any language of the plan meaningless or internally inconsistent, (3) whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, (4) whether they have interpreted the words at issue consistently, and (5) whether their interpretation is contrary to the clear language of the plan. *Donaldson*, 863 F.3d at 1039; *see King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (*en banc*).

D.      ERISA—Equitable Relief

Plan participants may also recover "other appropriate equitable relief" under 29 U.S.C. § 1132(a)(3). *CIGNA Corp. v. Amara*, 563 U.S. 421, 443, (2011) (recognizing that an equitable claim for surcharge, reformation, or estoppel may be permitted in some situations based upon an ERISA fiduciary's breach of a duty towards a covered employee); *see Silva,* 762 F.3d at 722 (recognizing the Supreme Court's decision in *Amara* changed the legal landscape by clearly spelling out the possibility of an equitable remedy under ERISA for breaches of fiduciary obligations by plan administrators). Equitable relief under § 1132(a)(3)(B) "is limited to those categories of relief that were typically available in equity during the days of the divided bench (meaning, the period before 1938 when courts of law and equity were separate)." *Montanile v. Bd. of*

*Trustees of Nat'l. Elevator Indus. Health Benefit Plan*, ⸺ U.S. ⸺, 136 S. Ct. 651, 657 (2016) (internal quotation marks omitted). Courts look to "cases and secondary legal materials to determine if the relief would have been equitable in the days of the divided bench." *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 362 (2006) (internal quotation marks omitted).

ERISA does not provide a standard for establishing harm from breaches by ERISA fiduciaries. *Amara*, 563 U.S. at 443. Such harm, however, includes detrimental reliance and the loss of a right protected by ERISA. *Id.* at 444. A restitutionary claim for premiums paid under § 1132(a)(3)(B) is potentially available to a beneficiary if there is a plan violation. *Ibson v. United Healthcare Servs., Inc.*, No. 16-3260, 2017 WL 6030647, at *4 (8th Cir. Dec. 6, 2017). The surcharge remedy extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary. *Amara*, 563 U.S. at 442. To obtain relief under the surcharge theory, a plan participant is required to show harm resulting from the plan administrator's breach of a fiduciary duty. *See id.* at 443-44 (stating a plan participant or beneficiary must show that the violation injured him or her, but need only show actual harm and causation); *see Silva*, 762 F.3d at 722 (involving allegations that employer breached its fiduciary duty to act in the interest of plan participants when it failed to provide participant with necessary information regarding enrolling in the Plan).

A reformation remedy may be available to reform contracts based on mutual mistake or fraud. *See Silva*, 762 F.3d at 722-23 (addressing the argument that an insurer breaches its fiduciary duty by collecting insurance policy premiums, reasonably inducing an employee to believe that his application for a supplemental life insurance

policy was approved and that no further action was needed, and then, after participant's death, denying that he had a valid policy). The concept of equitable estoppel can also be invoked in circumstances where "'proof of words or deeds (or sometimes omissions to speak or act) [ ] create a misleading impression upon which a reasonable person would rely.'" *Id.* at 724 (stating that evidence of wrongful retention of premiums from employees who lacked approved policies, and foregoing other insurance, can show reliance).

A Plan Sponsor breaches its fiduciary duty to act in the interest of plan participants when it fails to provide a participant with necessary information regarding the Plan. *Silva*, 762 F.3d at 721. The Supreme Court has stressed "[t]he relevant regulations . . . establish extensive requirements to ensure full and fair review of benefit denials." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004) (citing 29 C.F.R. § 2560.503–1). The regulations set forth "minimum requirements for employee benefit plan procedures pertaining to claims for benefits.'" *Midgett v. Washington Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 893 (8th Cir. 2009) (quoting 29 C.F.R. § 2560.503–1(a)).

As long as a claim for denial of benefits and a claim for breach of fiduciary duty assert different theories of liability, plan beneficiaries may assert both. *Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547 (8th Cir. 2017); *see also Silva*, 762 F.3d at 728 & n.12. Eighth Circuit caselaw "prohibit[s] duplicate recoveries when a more specific section of the statute, such as § 1132(a)(1)(B), provides a remedy similar to what the plaintiff seeks under the equitable catchall provision, § 1132(a)(3)." *Silva*, 762 F.3d at 726. "At summary judgment, a court is better equipped to assess the likelihood for duplicate

recovery, analyze the overlap between claims, and determine whether one claim alone will provide the plaintiff with 'adequate relief.'" *Silva*, 762 F.3d at 727 (8th Cir. 2014).

E.    Failure to provide SPD

Under 29 U.S.C. § 1024(b)(4), a plan administrator must furnish a SPD or other instruments under which the plan is established or operated to participants and beneficiaries upon written request.   "[T]he summary plan description's objective is to provide 'clear, simple communication' that states the terms and conditions of the Plan." *Silva*, 762 F.3d at 721 (quoting *Amara*, 563 U.S. at 437).   "ERISA's disclosure provisions were enacted to 'ensur[e] that the individual participant knows exactly where he stands with respect to the plan,' and the regulations promulgated under ERISA are designed to achieve that goal."  *Leyda v. AlliedSignal, Inc.*, 322 F.3d 199, 208 (2d Cir. 2003) (quoting *Bruch*, 489 U.S. at 118) (internal quotation marks omitted).  ERISA's disclosure provisions were designed to ensure that an individual participant knows exactly where he or she stands with respect to the plan.  *Bruch*, 489 U.S. at 118.  This requires ready access to information on how to apply for benefits and how to determine eligibility for benefits.  *Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781, 793 (7th Cir. 2009).

The ERISA statute and regulations describe the publication and disclosure requirements that apply to SPDs.  *See* 29 U.S.C. § 1024(b); 29 C.F.R. § 2520.  The statute requires the summary plan description to be "'written in a manner calculated to be understood by the average plan participant,' and it must contain, among other requirements, 'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits.'"  *Silva*, 762 F.3d at 721 (citations omitted) (quoting 29 U.S.C. §

1022(a) and (b)). The summary plan description must be "furnished" by the plan administrator to the plan participants by a method or methods of delivery likely to result in full distribution, and the administrator is required to use measures reasonably calculated to ensure actual receipt of the material by plan participants. *Id.* at 721. With respect to electronic distribution, the administrator must take appropriate and necessary measures that are reasonably calculated to ensure that the system for furnishing documents results in actual receipt of transmitted information (e.g., using return-receipt or notice of undelivered electronic mail features, conducting periodic reviews or surveys to confirm receipt of the transmitted information). 29 C.F.R. § 2520.104b–1(c)(1)(i) & (i)(A).

Penalties under § 1132(c) are designed to provide plan administrators with an incentive to comply with ERISA's disclosure requirements and to punish noncompliance. *Starr v. Metro Systems, Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006). Section 1132(c) sets the maximum penalty at $100 a day, but this has been increased by regulation to $110 per day. *See* 29 C.F.R. § 2575.502c–3. Whether to assess a penalty, and the amount, are committed solely to the Court's discretion. 29 U.S.C. § 1132(c). In exercising this discretion, courts primarily consider any prejudice caused to the plaintiff and the nature of the plan administrator's conduct. *Starr*, 461 F.3d at 1040. Prejudice in this context is not limited to a loss of benefits, but includes the lost time, effort, and money spent gaining access to information to which one was legally entitled. *See Brown v. Aventis Pharms., Inc.*, 341 F.3d 822, 825 (8th Cir. 2003). ERISA's requirements for furnishing SPDs to plan participants are quite demanding. *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 578 (6th Cir. 2010). Penalties begin to accrue 31 days after a

plan sponsor receives a participant or beneficiary's request and continue to accrue until the day before the Plan Sponsor furnishes the documents. *Boyadjian v. CIGNA Companies*, 973 F. Supp. 500, 507 (D.N.J. 1997); *see also Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 80 (3d Cir. 2001).

III.     DISCUSSION

As a threshold matter, the court determines that its review in connection with the plaintiff's denial of benefits claim is limited to the administrative record in this case. The affidavits submitted in connection with the motions will be considered only with respect to the claim for failure to timely furnish the SPD and the equitable claims.

The court reviews Metropolitan's denial of the plaintiff's optional life insurance benefits claim for an abuse of discretion since the SPD affords discretionary authority to determine eligibility to both the claims administrator and the plan administrator. The court will also consider as relevant the fact that the claims administrator is the paying entity in this case. The record does not contain evidence of any efforts by Metropolitan to ensure the conflict did not affect it eligibility determinations, so the court will give the conflict some weight.

Applying that standard, the court finds Metropolitan's decision to deny coverage is not supported by sufficient evidence and is therefore not a reasonable interpretation of the terms of the Plan. Metropolitan's characterization of the facts is simply unsupported. The Plan requires proof of good health before optional life insurance is effective. The SPD describes a process of answering five questions. The record before the court does not establish what questions Monarrez was asked, nor does it establish that he answered those questions and what his answers to the questions were. The

record shows widespread confusion between the employer, its third-party human resources administrator, and its insurer with respect to the requirements for obtaining optional life insurance coverage. First, a representative of the employer stated that the newly hired employee was not asked health related questions. Then a representative stated that the questions were asked but not recorded. Finally, the employer stated, without further explanation, that "the election was processed through a CSR via IVR enrollment." That statement is meaningless in the context of the record. The attachments apparently highlighting the supposed questions and purported answers—digital records, spreadsheets, data sets and time stamps—do not establish what the questions were, what the answers were, or who provided the answers. The documents lack foundation or authentication and provide no evidence of what happened at the time the decedent was hired by Ford and enrolled for benefits. There is no paper or electronic record of the plaintiff's decedent's application for optional life insurance benefits. Based on the record presented to the court, Metropolitan has not proved that Monarrez answered health-related questions untruthfully.

The record shows Metropolitan also had difficulty discerning what information had been provided by Monarrez, which is shown by its inconsistent reasons for the claim denial—first failure to report chest pain and then failure to report high blood pressure. Metropolitan has not shown that the decedent answered "no" to either of those questions. Internal communications indicate Metropolitan employees were befuddled about differences in paper as opposed to electronic questionnaires, exact wording, and differences in questions asked over time. The record shows no one reviewing the claim file knew whether the five questions referred to in the SPD were

posed to the enrollee.  The record contains one unidentified document that lists nine questions.  Even the computer evidence that Metropolitan relies on contain only partial questions.   When it became clear to Metropolitan that there was no record that Monarrez had been asked a question about chest pains, the focus turned to the high blood pressure inquiry.  Even if the court were to consider and fully credit the computer records, nothing establishes any link between the questions and answers and Jose Monarrez.   The evidence just as likely shows that the computerized records were generated by human resources personnel or by a third-party administrator or bureaucrat than by the decedent.   This is especially true in light of the evidence that Ford's representatives did not even know that the health questions were required.   The evidence of record does not establish that Monarrez was untruthful in his application for optional life insurance benefits.   Metropolitan's internal communications even show some level of unease in relying on the documents, in that the claim was repeatedly referred for senior review.

Moreover, even assuming Metropolitan had shown that Monarrez had answered "no" to the questions at issue, Metropolitan has not shown that it would have denied coverage to Monarrez had Monarrez truthfully answered "yes" to the queries about chest pains or high blood pressure.  Metropolitan's investigation and examination of the decedent's medical records did not result in any conclusive determination that coverage would have been denied, even if Monarrez had submitted a full "Statement of Health." The underwriter's communication seems to indicate that it was at best questionable whether coverage would have been denied.  She further noted that the medical records used by Metropolitan to deny coverage were "old and even the most recent information

gave no indication of chest pains" by Mr. Monarrez. The record shows continuing uncertainty with respect to what Monarrez had reported on his application and a lack of consensus as to whether or not he would have been denied benefits.

In spite of that uncertainty, Metropolitan denied the plaintiff's optional benefits. It paid lip service to policy language that was arguably not applicable, relied on vague statements in the SPD and ignored the plaintiff's requests for information. It made coverage decisions before it had obtained all the medical records and did not address the decedent's recent examinations and surgeries, instead relying on dated information that its own employees had questioned.

The court also finds the provisions of the plan that purportedly require proof of good health or evidence of insurability are vague and inconsistent. The provisions of the policy and SPD do not give a participant adequate notice or information about what is required to obtain "approval." There are also inconsistencies in the plan documents concerning the requirement for initially enrolling for benefits as opposed to those necessary to increase coverage under the plan. The plan documents state that the insurance is effective on different dates depending on whether the participant is required to give evidence of insurability, but is silent on the amount of insurance that would trigger evidence of insurability.

The court finds Metropolitan's decision to deny the claim is not consistent with the goals of the Plan which are to provide life insurance to Ford employees at the employees' own expense. The denial renders the language in the Plan involving proof of health, statements of health, and approval meaningless and internally inconsistent. The claims administrator's conduct also conflicts with the substantive or procedural

requirements of the ERISA statute, in that the plan documents do not reasonably convey the necessary information to participants. Further, the record shows the various decision-makers interpreted the policy requirements inconsistently and their interpretation is contrary to the language of the Plan. Accordingly, the court finds Metropolitan's denial of the plaintiff's claim for optional life insurance benefits was an abuse of discretion. The plaintiff has shown it is entitled to a summary judgment against Metropolitan.

Even if it were not an abuse of discretion for Metropolitan to deny optional life insurance benefits to the plaintiff, the plaintiff would nonetheless be entitled to summary judgment against Metropolitan for breach of fiduciary duty. Both Ford and Metropolitan are proper defendants with respect to the equitable claims. As discussed below, Ford's failure to timely furnish the SPD is one breach of its fiduciary duty. The evidence also establishes that both Ford and Metropolitan should be equitably estopped from denying coverage on Monarrez. The record establishes that Ford withheld premiums from the decedent's paychecks and processed the payments by forwarding them to Metropolitan. Metropolitan accepted the premiums. The decedent and the plaintiff relied on the withholding and processing of the premiums as a basis for the reasonable belief that they were covered by optional life insurance. The plaintiff has shown that she and her late husband relied on that belief of coverage to their detriment, foregoing other insurance coverage. The evidence shows Ford breached its fiduciary duty to properly administer the group life insurance policy in the sole interest of its insured employees and their beneficiaries. Ford allowed Monarrez to enroll in the plan effective November 1, 2013, allowed him to renew optional life insurance coverage in January 2014 and

January 2015 respectively, and withdrew premiums for the entire period of time. Further, it failed to provide the participants and beneficiaries with information sufficient to cause them to be adequately informed in decisions to pursue benefits.

Monarrez, assuming he had read the entire policy and SPD, would have been reasonable in a belief that no additional medical information, in the form of a statement of health, was required. The policy is silent on information needed during initial enrollment, silent on the meaning of a statement of health or proof of insurability, and silent as to the form or timing of any required approval. Neither the Plan (the certificate of insurance) nor the SPD provided a definition or conveyed any clear understanding of the requirements for a statement of health. Further, it did not concisely convey what the "approval" process ordained.

Under the circumstances, Monarrez would have been justified in any belief that Ford and Metropolitan either had sufficient evidence of his good health and insurability or had waived any proof of good health requirement for optional coverage on initial enrollment. It is not clear to the court what a reasonable person in Monarrez's position could have done differently to prevent this situation. In light of the payment of premiums, annual re-enrollments, and required physical examinations under the wellness program that was part of Ford's benefits plan, Monarrez was reasonable in believing he had optional life insurance coverage and Ford is estopped from denying coverage. *See, e.g., Van Loo v. Cajun Operating Co.*, No. 16-1980, 2017 WL 3034275 (6th Cir. July 18, 2017); *Silva*, 762 F.3d at 723-24. Accordingly, both defendants are

liable to the plaintiff for breach of fiduciary duty and the plaintiff is entitled to summary judgment against Ford and Metropolitan on her equitable claims.[7]

With respect to the failure to provide an SPD claim, Ford admits that it timely failed to provide the plaintiff with a copy of the SPD. Nothing in the record substantiates its claim of "substantial compliance." Ford has propounded no reasons for the delay other than inadvertence. The plaintiff has been prejudiced by the delay in that she has now waited for years to collect life insurance rightly due her and has had to expend money in pursuit of her claims. In view of the fact that the information necessary to process the claim was likely in Ford's, or its agent third-party administrator's possession, its failure to timely furnish the SPD to its beneficiary is not excusable. The court thus finds a penalty is warranted.

Thirty days elapsed on October 7, 2016, and the penalties began to run from the 31st day, October 8, 2016. Ford furnished the documents on October 28, 2016. The penalties run until the day before Ford furnished the documents. October 27, 2016. This comes to a total of 19 days.

The court sees no reason to exercise its discretion to reduce the amount of Ford's liability from the statutory maximum. Accordingly the court will impose a penalty on defendant Ford for its failure to produce Plan documents in the amount of $2,090.

IT IS ORDERED:

---

[7] A duplicative recovery is not allowed, however. Although a plaintiff can pursue an equitable action in the nature of a surcharge for the sums allegedly withheld from her by the denial of benefits, the remedy for that denial, award of a sum sufficient to compensate her for the wrong, would duplicate the relief awarded for the section (a)(1)(B) violation. The plaintiff has not requested equitable relief other than the award of benefits. The significance of this holding relates only to Ford's potential liability for attorney fees.

1.     The motions for summary judgment filed by Defendants Metropolitan and Ford (Filing Nos. 56 and 58) are denied.

2.     The motion for summary judgment filed by plaintiff (Filing No. 65) is granted.

3.     MetLife Group, Inc. is dismissed as a party defendant.

4.     Plaintiff shall file a motion for attorney fees within fourteen (14) days of the date of this order.

5.     After the attorney fee issue is resolved, judgment will be entered in favor of the plaintiff and against defendant Ford in the amount of $2,090.00 on the plaintiff's failure to provide plan documents claim;

6.     Judgment will be entered in favor of the plaintiff and against defendant Metropolitan in the amount of $92,694.00 on the plaintiff's claim for denial of benefits;

7.     Judgment will be entered in favor of the plaintiff and against defendants Metropolitan and Ford on the plaintiff's equitable claims.

Dated this 28th day of December, 2017.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge